Filed 1/12/23  In re Melissa H. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Melissa H. et al, Persons Coming Under the Juvenile Court Law. | B315094<br><br>(Los Angeles County Super. Ct. No. 20CCJP04240A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JING H.,<br><br>Defendant and Appellant;<br><br>DAN S.,<br><br>Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

John P. McCurley for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy,

Assistant County Counsel, and Sarah Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

Pamela Rae Tripp for Respondent.

_____

At a jurisdiction hearing 10 months after the original dependency petition had been filed, the juvenile court sustained an amended petition filed by the Los Angeles County Department of Children and Family Services pursuant to Welfare and Institutions Code section 300, subdivision (b)(1),[1] alleging Jing H. and Dan S., the father and mother of now-16-year-old Melissa H. and 11-year-old Hammond H., had a history of engaging in escalating verbal arguments and physical altercations in the children's presence that endangered the children's physical health and safety and placed them at risk of serious physical harm. On the same day as the jurisdiction hearing, the court at disposition declared Melissa and Hammond dependent children of the court; found it was not necessary to remove the children from the care and custody of their parents; entered a permanent mutual restraining order requiring Jing and Dan to stay at least 100 yards away from each other; and conditionally terminated its jurisdiction pending receipt of a juvenile custody order awarding the parents joint physical and legal custody, but rejecting Jing's request that he have 50 percent custody time with Hammond.

On appeal Jing contends the jurisdiction finding and disposition order declaring the children dependents of the court were not supported by substantial evidence, arguing any risk to the children from the parents' acts of domestic violence had been

_____

[1] Statutory references are to this code unless otherwise stated.

2

eliminated by the time of the June 2021 jurisdiction and disposition hearings due to the passage of time; the fact that he and Dan were living in separate residences; and restraining orders, initially ordered on a temporary basis by the family court prior to initiation of the dependency case, eliminated any need for juvenile court oversight. Jing also contends, even if jurisdiction was properly assumed by the juvenile court, the court abused its discretion in entering a custody order that granted joint physical custody of Hammond, but limited his custody time to every other weekend and Wednesday evenings for dinner.

We affirm the juvenile court's jurisdiction finding and disposition and custody orders.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Procedural Overview*

Prior to the family's initial referral to the Department, Jing and Dan were going through a contentious marital dissolution.[2] However, they both continued to reside in the family's Beverly Hills residence with an agreement to alternate days during which one of the parents would stay with the children in the three-bedroom main house and the other would live in a one-bedroom guesthouse on the property. In early July 2020 the family court issued temporary mutual restraining orders requiring Jing and Dan to stay 10 yards away from each other. The orders did not require either parent to move out of the family residence and

---

[2] In a declaration filed in support of his request for a domestic violence restraining order, Jing said, although he had filed a petition for dissolution of the marriage in April 2010 and he and Dan had separated that year, they did not decide to proceed with the dissolution of their marriage until the fall of 2019.

made no provisions regarding child custody or visitation, and Jing and Dan persisted in living in the same residence on alternating days.

The original dependency petition, alleging counts under section 300, subdivisions (a) and (b), was filed on August 12, 2020. Several days earlier the juvenile court authorized the Department to remove Melissa and Hammond from their parents' custody based on allegations of domestic violence between Jing and Dan. That removal was confirmed at a detention hearing held on August 17 and 18, 2020. The Department placed the children with their maternal aunt and uncle in Hacienda Heights. The court ordered monitored visits for Jing and Dan and reissued the temporary restraining orders previously issued by the family court.

The Department filed an amended dependency petition on September 11, 2020. At a hearing following that filing, the court released Melissa to Dan, and Hammond to both parents, under the supervision of the Department and on condition the parents not live in the same residence. The court further ordered Hammond's primary residence be with Dan; Jing had custody of the boy every other weekend and Wednesday evenings for dinner. The court again reissued the temporary mutual restraining orders.

The court began the jurisdiction hearing in November 2020. In January 2021 the court granted in part Jing's motion to dismiss the petition, leaving in place the allegations relating to domestic violence as alleged in counts under section 300, subdivisions (a) and (b)(1). The jurisdiction hearing continued for several additional days in February through May 2021, with testimony from the dependency investigator, Dan and Jing, and

4

multiple exhibits introduced into evidence by each of the parties. The parents' and children's counsel submitted written closing arguments; the Department presented its closing argument orally in June 2021.

The juvenile court sustained in part the first amended petition on June 24, 2021. Immediately following the jurisdiction hearing, the court proceeded to disposition, declaring Melissa and Hammond dependent children of the court. The court ruled there was no need to remove the children from their parents' custody and stated it intended to terminate its jurisdiction with a juvenile custody and visitation order that tracked the order for Jing's time with Hammond that had been in place since September 2020. The court also issued a three-year mutual restraining order requiring Jing and Dan to remain 100 yards apart, rather than 10 yards as provided in the temporary orders.

2. *The December 15, 2019 and June 30, 2020 Incidents*

In addition to generally finding Jing and Dan had an extended history of verbal and physical altercations, the sustained dependency petition pursuant to section 300, subdivision (b)(1), identified two specific incidents of domestic violence: one on December 15, 2019, and the second on June 30, 2020. Viewing the evidence before the juvenile court in the light most favorable to its findings, as we must on substantial evidence review (see *In re I.J.* (2013) 56 Cal.4th 766, 773), Jing and Dan had engaged in violent altercations with each other; and each had been the aggressor on occasion.

On December 15, 2019 Dan came to Jing's bed holding a small container (a flask or thermos) of water as he was watching television. She told Jing, if he did not keep the sound down, she

would pour hot water on him.  She then did so.  Jing called the police, and Dan was arrested.

On June 30, 2020 Dan was at the guesthouse when Hammond phoned or texted her for help with bleeding from a tooth.  Dan went to the main house to check on Hammond and found him sitting on one of four kitchen barstools with a bloody tissue in his mouth.  She sat down next to Hammond to inspect his mouth.  Jing, who was at the kitchen sink, told Dan she was sitting in Jing's seat and demanded she get up.  Dan ignored Jing.  Jing told Dan he and Hammond had not finished breakfast and ordered her to get out of the kitchen.  Jing started yelling at Dan and then pulled the stool from underneath her.  Because Dan's arms were on the counter, she did not fall.  Jing hit Dan's arm with his elbow, shoved himself between Dan and Hammond and hit Dan with his elbow a second time, causing her to fall over the barstool next to her.  Dan left the kitchen.  As she did, she could hear Jing telling Hammond, "Mommy is bad; she shouldn't have taken my seat."  Dan called the police, who came to the house and arrested Jing.[3]

In addition to these two episodes, Dan claimed Jing had during their marriage slammed a door on her, striking her shoulder and elbow on at least one occasion; pushed and twisted her arm; broke objects in the home and threw them; kicked a door and caused the door frame to break in Melissa's presence; and

---

[3]    In her July 6, 2020 declaration in support of her request for a domestic violence restraining order in family court, Dan stated, when Jing pushed against her chest, causing her to fall against the stool, the "force of Jing's jab knocked the wind out of [her] and caused [her] head to snap back."  Her head, neck and back continued to hurt a few days after the June 30, 2020 incident.

threatened to kill Dan. Jing asserted Dan had struck his ribs with her fists; hit him with a cell phone; and ripped Jing's shirt in the children's presence.

### 3. *Minor's Counsel's Recommendation to the Court*

In her written closing argument for the jurisdiction hearing, minor's counsel explained the children had been residing primarily with Dan since September 16, 2020; Melissa had not wanted any contact with Jing; Hammond consistently requested limited contact with Jing; and, although children's wishes should not always be determinative, she believed the children's wishes and their best interests were aligned. She supported her belief that limited contact between Hammond and Jing was in Hammond's best interests on various grounds, including Hammond's having told her that Jing had been discussing the dependency case with him despite Hammond's request to Jing not to do so, placing the child in the uncomfortable position of having to take sides in the conflict between the parents, which was neither appropriate nor healthy for the child; Hammond saying he had been frequently upset witnessing Jing's anger; and Hammond having expressed feeling more support and less anxiety when residing with Dan.

Hammond's living preference, his counsel continued, was reinforced by the outside observations of others, including Hammond's therapist, who agreed limited contact with Jing was in Hammond's best interest. Although the therapist observed emotional growth from Dan since the case's inception, the therapist had not observed similar growth from Jing; rather, the therapist stated, "Father displays rigid and easily angered behavior . . . . The father lacks insight about child development and is not open to hearing suggestions and can be combative."

7

Accordingly, minor's counsel requested the court order joint physical and legal custody of Hammond, but with Hammond's primary residence to be with Dan and Hammond to continue with the existing schedule of custody time with Jing.

4. *The Juvenile Court's Jurisdiction Finding*

As discussed, the juvenile court sustained the dependency petition in part, finding the Department had proved most of the section 300, subdivision (b)(1), allegations of domestic violence. It dismissed the subdivision (a) allegations. Elaborating on its finding, the court stated the parental conflict "has been going on for years" concerning issues in the marriage and the control of the children and property "to the point that the parents have become physically territorial around their children and in the home."

The court explained it was modifying the subdivision (b)(1) allegations by, among other changes, striking references to Jing's and Dan's arrests for domestic battery of each other as not relevant; replacing the phrase "threw hot water at" with "spilled hot water on" Jing for the December 15, 2019 incident because it believed "there was some intent there but 'threw' is not really the right verb"; and striking all references to specific incidents other than the December 15, 2019 and June 30, 2020 incidents. It clarified, "[E]ven though I am striking reference to these other incidents, I'm not finding it didn't happen; I'm finding there was some prior violence but I'm not going to make specific findings as to each of those incidents."[4] The court found, although the

_____

[4] The court further explained it had some concerns about the parents' credibility in describing these past conflicts but nonetheless expressly found "there is some evidence of prior domestic violence because the nature of the parents' relationship

8

parents had engaged in some services, they had not shown "any real progress" and, if the parents were "together in any way," they would "continue to have these escalating and physical arguments."

5. *Disposition, the Restraining Order and the Decision To Terminate Jurisdiction with a Custody Order*

Following its jurisdiction finding the court asked, "Now before we get to the [domestic violence restraining order], what does counsel want to do about disposition? Were you expecting to handle it today?" Jing's counsel responded he was ready to proceed. The court admitted for purposes of the disposition hearing all exhibits that had been admitted for the jurisdiction hearing and ruled all testimony offered during the jurisdiction hearing would be part of the disposition hearing.

The court declared the children dependents of the court. Turning to the question whether it was necessary to remove the children from the custody of either parent pursuant to section 361, subdivision (c), or to keep the case open for services, the court ruled the evidence was insufficient to require removal and stated its intention to terminate its jurisdiction. "What we have is a bitter custody battle that has resulted in the parents engaging in escalating arguments that have become physical and threaten to become physical again. . . . That risk will be addressed by the restraining order that I'm going to order. . . . I understand that not all issues will be resolved, but this court's supervision is not needed to further resolve the disputes between the parents and the custody issues. Those were custody issues

has been so intense and negative for a long period of time. . . . I can infer there has been prior domestic violence."

that don't rise to the level of a risk to the children.  There is some risk that the custody battle causes some emotional harm to the children, but I do not find it rises to the level where I can remove the children from either parent."

With respect to custody on a going-forward basis, the court stated the children's primary residence would be with Dan, which the court noted (as had minor's counsel) had been the existing arrangement and with which the children had expressed happiness, and indicated it would enter a juvenile custody order providing for joint legal and joint physical custody with the arrangements for Hammond to reflect "the current schedule," but with Jing to also have Hammond for up to two weeks for any planned summer vacations.  The court directed the parties to work out an arrangement as to "regular holidays and such."  As for Melissa, the court stated it would provide the parties some time to agree on an arrangement; and, if the parties were unable to do so, it would make an arrangement on July 28, 2021, the day it scheduled for a further hearing to finalize the juvenile custody order.

The minute orders for June 24, 2021 stated the court found the conditions justifying the assumption of jurisdiction no longer existed and were not likely to exist if supervision was withdrawn. The court terminated its jurisdiction as to both children with termination stayed pending receipt of the juvenile custody order at the hearing on July 28, 2021.

The court next addressed the requests for restraining orders and found there was a sufficient basis to grant a three-year restraining order protecting each parent from the other by prohibiting them from coming within 100 yards of each other and from being "on the home property together."  It declined to grant

an order excluding either parent from the property.  The juvenile court signed and filed the restraining orders on June 30, 2021.

      6.  *The Custody Hearing and Order*

The custody hearing was continued to August 11 and 13, 2021.  After hearing the parties' requests, the court entered a juvenile custody order for Melissa and Hammond providing for joint legal and physical custody with the primary residence for both children to be with Dan.  Jing was generally to have the following custodial time:  Every Wednesday at 3 p.m. until return to Dan's home by 7 p.m.; every other weekend; and additional time, which included holidays and summer and other breaks, according to a detailed scheduled that provided for the parents to each have time with the children.

## DISCUSSION

      1.  *Substantial Evidence Supports the Juvenile Court's Finding of Jurisdiction over Hammond*

      a.  *Governing law and standard of review*

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2, subd. (a); see *In re A.F.* (2016) 3 Cal.App.5th 283, 289; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.)

Section 300, subdivision (b)(1)(A), provides a child is within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:  [¶] (A)  The failure or inability of the child's parent or guardian to adequately supervise or protect the child."  A jurisdiction finding under section 300, subdivision (b)(1)(A), requires the Department

11

to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness.  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; see *In re R.T.* (2017) 3 Cal.5th 622, 624 ["section 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child"].)

Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146), the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383; *In re N.M.* (2011) 197 Cal.App.4th 159, 165.)  The court may consider past events in deciding whether a child currently needs the court's protection.  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216; *In re N.M.*, at p. 165.)  A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461; accord, *In re J.N.* (2021) 62 Cal.App.5th 767, 775 ["[e]vidence of past conduct may be probative of current conditions, and may assist DCFS in meeting [its burden of proof]"]; *In re Kadence P.*, at p. 1384.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all

reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; see *In re I.C.* (2018) 4 Cal.5th 869, 892.)

      b. *There was ample evidence domestic violence between Jing and Dan placed Hammond at substantial risk of serious physical harm*

Exposure to domestic violence may serve as the basis for a jurisdiction finding under section 300, subdivision (b)(1). (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.) "'"Both common sense and expert opinion indicate spousal abuse is detrimental to children."'" (*Id.* at p. 942; see *In re S.O., supra*, 103 Cal.App.4th at pp. 460-461 ["'domestic violence in the same household where children are living *is* neglect; it is a failure to protect [them] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it'"]; see also *In re L.O.* (2021) 67 Cal.App.5th 227, 238 ["[j]urisdiction is appropriate since a minor can be 'put in a position of physical danger from this violence, since, for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg'"]; *In re T.V.* (2013) 217 Cal.App.4th 126, 135 ["[e]ven though [the child] had not been physically harmed, the cycle of violence between the parents constituted a failure to protect her"].)

Jing argues the evidence did not show Hammond was at substantial risk of serious physical harm because, although the first amended petition alleged multiple episodes of domestic violence, the court had found true only the December 15, 2019 and June 30, 2020 incidents, which the court stated at the

jurisdiction hearing did not involve a level of violence "as high or as extreme as in many other domestic violence cases." The premise for this argument is seriously flawed: That there may be other cases in which the parents were more violent does not mean the evidence was insufficient for the court to find Jing and Dan's altercations placed Hammond at substantial risk of serious physical harm, particularly since Hammond not only was present for, but was actually in the middle of, the June 30, 2020 fight, which resulted in Dan's injury and Jing's arrest. Moreover, Jing ignores the court's finding, in addition to the two specific instances identified, that he and Dan had a history of domestic violence to which their children were repeatedly exposed. Indeed, the court stated when sustaining the first amended petition there was a history of domestic violence that "wasn't limited to simply the December incident and the June incident."

Jing relies on other evidence—emphasizing, for example, the incidents did not result in criminal charges and Hammond was eight years old at the time of the June 2020 incident and thus not as fragile as an infant—to argue the evidence did not support the court's finding of a substantial risk of serious injury. Jing's argument essentially invites us to reweigh the evidence, a task outside the proper scope of appellate review. (See, e.g., *In re I.J.*, *supra*, 56 Cal.4th at p. 773 ["'"[w]e do not reweigh the evidence"'"]; see also *People v. Gomez* (2018) 6 Cal.5th 243, 309 ["'[i]n deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts'"].)

Jing also points out that the section 300, subdivision (b)(1), allegation sustained by the court on June 24, 2021 stated he and Dan continued to reside in the same house, while the evidence showed by that time they had not lived together for nearly

10 months.  He also notes there had been no further instances of domestic violence after they began living separately.

Although Dan moved from the Beverly Hills home in September 2020 to comply with the juvenile court's condition for release of the children from their out-of-home placement (that she and Jing not live together), Jing misperceives the import of the language in the sustained finding.  The reference to the parents continuing to reside in the same house followed the allegations of their history of escalating verbal arguments and physical altercations and of the December 2019 and June 2020 incidents.  There was abundant evidence the parents had, in fact, continued to live in the Beverly Hills family residence after multiple incidents of domestic violence, creating the ongoing risk of new episodes of violence.  Indeed, even after the family court issued temporary mutual restraining orders in July 2020, requiring each parent to stay at least 10 yards from the other but not from the other's home, Dan and Jing continued to reside in the Beverly Hills family home under their agreement to alternate between the main house and the guest house.

Moreover, in discussing its jurisdiction finding at the hearing, the court did not suggest it believed Dan and Jing were both still living in the Beverly Hills house.  After stating the parents were not showing any real progress and would likely continue their battle for control of the house and the children, the court observed that Dan had moved out to ensure the children could live with her, while Jing stayed in the house.

Finally, Jing's reliance on the permanent mutual restraining orders to argue it was unnecessary for the court to sustain the dependency petition fundamentally misapprehends the status of the case at the time of the jurisdiction hearing.

When the court found Melissa and Hammond were children described by section 300, subdivision (b)(1), there were no permanent restraining orders in place, only temporary orders requiring Jing and Dan to stay 10 yards away from each other. And those temporary orders did not prohibit them from continuing to reside together at the family home in Beverly Hills, the site of ongoing domestic violence. Moreover, the question at the jurisdiction hearing was whether the children were at substantial risk of serious physical harm, not what measures were necessary to protect them if they were. That issue was addressed at disposition.

2. *The Juvenile Court Did Not Abuse Its Discretion by Declaring Hammond a Dependent of the Court*

Once the juvenile court has made a finding at the jurisdiction hearing that a child is a person described by one of the subdivisions of section 300, it may adjudge the child to be a dependent child of the court. (§ 360, subd. (d).) As we explained in *In re Destiny D.* (2017) 15 Cal.App.5th 197, 205-206, "Typically, once the child has been adjudged to be a dependent child pursuant to section 360, subdivision (d), the juvenile court determines what services the child and family need to be reunited and free from court supervision. [Citations.] The court then sets a review hearing, which must be held within six months, to evaluate the family's circumstances and decide whether continued dependency jurisdiction is necessary." Nonetheless, we held, "the juvenile court retains the discretion in an appropriate case to terminate its jurisdiction at the close of a disposition hearing when it finds services and continued court supervision are not necessary to protect the child" (*id.* at p. 208), provided, "protections imposed at disposition will be sufficient to

permit the conclusion that termination is appropriate." (*Id.* at p. 211.)

Several other statutory provisions arm the juvenile court with the tools needed to protect a child like Hammond when terminating dependency jurisdiction. Section 362.4, subdivision (a), authorizes the court, after adjudicating a child a dependent child of the court at disposition, to issue protective orders pursuant to section 213.5 and "an order determining the custody of, or visitation with, the child." Section 213.5, subdivision (a), in turn, provides the juvenile court may issue protective orders on behalf of children and their parent or current caregiver from the time a petition has been filed to declare a child a dependent child of the juvenile court until the petition is dismissed or dependency is terminated.[5]

The juvenile court has broad authority to declare a child a dependent child of the court; we review the determination to do so for abuse of discretion. (See *In re Ethan C.* (2012) 54 Cal.4th 610, 637 ["The dependency scheme in general . . . leaves ample room for discretionary treatment that allows for the equities of particular situations"]; *In re Corrine W.* (2009) 45 Cal.4th 522, 532 ["'[T]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a

---

[5]      Section 213.5, subdivision (d)(1), allows the juvenile court to issue protective orders upon notice and a hearing and further provides, "A restraining order granted pursuant to this subdivision shall remain in effect, in the discretion of the court, no more than three years, unless otherwise terminated by the court, extended by mutual consent of all parties to the restraining order, or extended by further order of the court on the motion of any party to the restraining order."

dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion'"].)

Relying on the legislative policy that a child remain a dependent child of the court only as long as necessary, Jing argues a declaration of dependency was not required here because the court had stated its intent to protect the children through issuance of permanent mutual restraining orders and, pending those orders, there were temporary mutual restraining orders in place that adequately protected the children, as demonstrated by the absence of any additional incidents of domestic violence after the family court first issued them. Again, Jing's argument disregards the reality of the parties' situation and misperceives the import of the court's rulings and statements explaining them.

The fact there was no further domestic violence after the Department filed the initial dependency petition in August 2020 and Jing and Dan were under the scrutiny of both the Department and the juvenile court provides no support for Jing's contention it was the family court's mutual temporary restraining orders that were responsible for his and Dan's cessation of physical confrontations. To the contrary, there was ample evidence to support the juvenile court's view the truce (and thus the children's safety) was only made possible by the combination of restraining orders and orders defining the nature of the parents' shared custody and establishing a specific visitation schedule. And to provide that protection for the children in the future, the court could not dismiss the petition, as Jing urged it to do, but, pursuant to section 362.4, subdivision (a), had to adjudge the children dependents of the court in order to

enter juvenile custody orders continuing the shared custody and visitation schedule it believed was necessary.[6]

While acknowledging a continuing custody order could only be made after disposition adjudging the children dependents of the court, Jing contends the court found custody orders were not necessary to protect the children from harm. It did not. Although, as discussed, the court stated its "supervision is not needed to further resolve the disputes between the parents and the custody issues," that was an explanation why it could terminate its jurisdiction. The orders to be issued—both restraining and custody orders—would adequately protect the children; further court oversight was not required (although the court cautioned it could become necessary once again in the future). The court's next comment that the parents' custody battles, although causing the children emotional harm, "don't rise to the level of risk to the children," was an explanation why the court did not order either child removed from parental custody pursuant to section 361, subdivision (c), as made clear when the court reiterated, "I do not find it rises to the level where I can remove the child from either parent." These were not statements, let alone a finding, that custody orders pursuant to section 362.4 were not necessary to protect the children. Indeed, the court made termination of its jurisdiction contingent on the

---

[6]     Section 362.4, subdivision (a), authorizes the court to issue a juvenile custody order only when it "terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court." And as we explained in *In re Anna T.* (2020) 55 Cal.App.5th 870, 877, "[O]nly a juvenile court custody order issued pursuant to section 362.4, not any juvenile court order affecting custody, will continue in effect after termination."

19

signing of the custody orders, unequivocally demonstrating its determination that those orders were needed to sufficiently resolve the risks to the children's safety that prompted the initiation of dependency proceedings.[7]

3. *Any Error in the Custody Order Relating to Hammond Would Be Harmless*

When making a custody determination under section 362.4, "'the court's focus and primary consideration must always be the best interests of the child.'" (*In re T.S.* (2020) 52 Cal.App.5th 503, 513; accord, *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268; *In re John W.* (1996) 41 Cal.App.4th 961, 965 ["it is the best interests of the child, in the context of the peculiar facts of the case before the court, which are paramount"]; see *In re Chantal S.* (1996) 13 Cal.4th 196, 206.) This determination is made without reference to preferences or presumptions ordinarily applicable in the family court. (See, e.g., *In re C.M.* (2019) 38 Cal.App.5th 101, 109-110; *In re John W.,* at p. 972.)[8]

Jing contends the juvenile custody order as to Hammond improperly restricted his physical custody of the child to every other weekend and one weeknight per week, arguing that

---

[7]     Asked by Dan's counsel at the custody hearing about termination of dependency jurisdiction, the court indicated it had made termination contingent on the signing of the custody orders, which, the court explained, was what it meant when it stayed termination pending receipt and signing of those orders.

[8]     We review a juvenile court custody order for abuse of discretion. (*In re C.W.* (2019) 33 Cal.App.5th 835, 863; *In re M.R.* (2017) 7 Cal.App.5th 886, 902; see *In re T.H.* (2010) 190 Cal.App.4th 1119, 1124.) In applying that standard, however, we review questions of law de novo. (E.g., *In re C.B.* (2010) 190 Cal.App.4th 102, 123.)

schedule effectively granted sole physical custody to Dan with visitation by Jing, not joint physical custody as the court stated it was ordering. In support Jing relies on the definition of "joint physical custody" in Family Code section 3004,[9] as well as cases interpreting that provision. (See, e.g., *In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 760 [listing family law cases holding it was not joint physical custody when fathers had alternate weekends, one weeknight per week and other periods agreeable to the parties]; see also *In re A.R.* (2015) 235 Cal.App.4th 1102, 1119, fn. 5 [noting the definition of "joint physical custody" under Family Code section 3004 in referring to the failure of the juvenile court's disposition order to distinguish between physical custody and legal custody]; but see, e.g., *In re Chantal S.*, *supra*, 13 Cal.4th at pp. 206-207 ["application of a family-law-based joint custody presumption would be inconsistent with the purpose of juvenile court law" because, "'[a]lthough both the family court and the juvenile court focus on the best interests of the child, the juvenile court has a special responsibility to the child as *parens patriae* and must look at the totality of the child's circumstances'"; "the Legislature knows how to make the Family

---

[9]    Family Code section 3004 provides, "'Joint physical custody' means that each of the parents shall have significant periods of physical custody. Joint physical custody shall be shared by the parents in such a way so as to assure a child of frequent and continuing contact with both parents, subject to Sections 3011 and 3020." Family Code section 3020, at subdivision (b), provides in part an exception to the public policy of ensuring that children have frequent and continuing contact with both parents "when the contact would not be in the best interests of the child." Family Code section 3011 provides the factors a court is to consider in determining the best interests of the child.

Code applicable to the juvenile court when it intends to do so, and . . . the Legislature's omission to do so . . . reveals that the Legislature did not intend that section to apply in juvenile court proceedings"]; *In re C.M.*, *supra*, 38 Cal.App.5th at p. 109 [referring to "the long line of precedent that the Civil and Family Codes are not applicable in dependency cases unless expressly stated"].)

Whatever the merit of Jing's argument, and even assuming he did not forfeit the issue by failing to raise his objection in the juvenile court, any error was harmless—that is, it is not reasonably probable a result more favorable to Jing would have been reached in the absence of the error. (See, e.g., *In re Celine R.* (2003) 31 Cal.4th 45, 59-60.) As Jing concedes, the juvenile court made clear its intent the order reflect, with limited exceptions for holidays and miscellaneous other occasions, the preexisting court-ordered custody arrangement granting Dan "primary residence of the children"—an arrangement with which the children had been happy (and that their counsel endorsed). That preexisting arrangement had restricted Jing's physical custody of Hammond to alternate weekends and one weeknight. Thus, any inconsistency between the custody order and the schedule was merely one of nomenclature—that is, of mislabeling the existing arrangement as one for joint physical custody rather than liberal visitation by Jing. Had the court been alerted to that error (assuming it was indeed error), it is highly improbable the court would have altered Jing's underlying custodial time with Hammond rather than merely recharacterizing its order as one for sole physical custody by Dan and liberal visitation by Jing—a result that would not have been more favorable to Jing.

What is paramount is whether the court-ordered arrangement of Jing having physical custody of Hammond on alternate weekends, one weeknight and miscellaneous additional time was in the child's best interests, regardless of the label attached to it. Ample evidence supported the court's implied finding that arrangement was in Hammond's best interest. The court acted well within its considerable discretion in ordering it.

    4. *The Appeal as to Melissa*

Evaluating the jurisdiction finding and disposition order as to Melissa could be somewhat different from the issues as they relate to Hammond. Melissa is five years older than her brother (she was nearly 15 years old at the time of the June 24, 2021 jurisdiction and disposition hearings) and, unlike Hammond, was not present during either of the two most recent episodes of domestic violence found to have occurred by the juvenile court. But Jing does not differentiate between his two children in arguing the court's jurisdiction finding and disposition order are not supported by substantial evidence. And he does not challenge the juvenile custody order entered for Melissa, as he does with Hammond.[10] Accordingly, for the reasons discussed, the jurisdiction finding, disposition and custody orders as to Melissa are also affirmed.

---

[10]     Arguably, because the court terminated its jurisdiction and Jing does not appeal the custody order as it relates to Melissa, Jing's appeal as to her is moot—we can provide no effective relief even if we were to find reversible error. (See *In re Rashad D.* (2021) 63 Cal.App.5th 156, 163-164; *In re D.N.* (2020) 56 Cal.App.5th 741, 757.)

## DISPOSITION

The juvenile court's jurisdiction finding and disposition and custody orders are affirmed.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.